# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

KIRT K. HALL                                 CIVIL ACTION

VERSUS

BURL CAIN, WARDEN, ET AL.                 NO. 99-0541-BAJ-DLD

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

This matter is before the Court on the petitioner's second amended application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, rec.doc.no. 74. The petitioner has also filed a Motion for an Evidentiary Hearing, rec.doc.no. 84.

The petitioner, Kirt K. Hall, originally challenged his 1992 state court conviction in this Court, asserting that the conviction was constitutionally deficient because:

> (1) He was denied his Sixth Amendment Right to Counsel due to a conflict of interest between himself and his attorney which precluded the attorney's undivided loyalty and effective assistance;
>
> (2) The trial judge gave an improper instruction to the jury on voir dire as to the meaning and definitions of "reasonable doubt" and "preponderance of the evidence";
>
> (3) The trial judge's instructions to the jury improperly shifted the burden of proof to the defense to prove the elements of manslaughter; and
>
> (4) The petitioner was improperly compelled to prove his incompetence to stand trial by "clear and convincing" evidence, and the trial judge failed to rule on the petitioner's competency to stand trial.

Pursuant to Report and Recommendation dated March 15, 2004, approved by the District Judge on April 19, 2004, rec.doc.nos. 20 and 23, this Court rejected the petitioner's claims and recommended dismissal of the petitioner's application. On appeal to the United States Court of Appeals for the Fifth Circuit, however, the appellate court interpreted the petitioner's Objection to the Report and Recommendation as a request for leave to amend his application in order to attempt to show, relative to the first claim above, that his attorney provided actual deficient performance as a result the alleged conflict of interest and actual prejudice resulting therefrom. See Strickland v.

Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). According to the petitioner, the referenced conflict arose because, at the time of the petitioner's criminal trial and, unbeknownst to the petitioner, his counsel, Robert F. Monahan, was under an indictment issued by federal authorities and was under investigation by state authorities on drug charges. The petitioner asserts that, as a result, his counsel failed to take appropriate actions on the petitioner's behalf or took actions detrimental to the petitioner's interest in an effort to obtain favorable treatment from federal and state authorities in connection with the pending indictment and investigation.

<u>HISTORY OF THE CASE</u>

Pretrial and Trial Proceedings

According to the evidence adduced at trial, the petitioner, then eighteen (18) years old, arrived at Glen Oaks High School on the morning of February 17, 1992. At some time after 7:00 a.m., he approached the decedent, Marlon Wells, a fellow student, and fired one shot from a handgun into the back of the decedent's head. The evidence further reflected that there had been acrimony, threats and arguments between the petitioner and Marlon Wells for several days or weeks prior to the incident, apparently because of bad feelings regarding a girl with whom both parties had been communicating.

The record reflects that the petitioner was indicted on February 20, 1992, on a charge of second degree murder in connection with the shooting of Marlon Wells. On February 26, 1992, the petitioner was arraigned in open court on the referenced charge, and attorney Robert Monahan was enrolled as the petitioner's counsel of record. The petitioner pled not guilty to the charge and, on motion by the State on that date, the trial was scheduled to commence on June 1, 1992. Between March 4 and March 10, 1992, attorney Monahan filed numerous pretrial motions, including motions to substitute a plea of not guilty and not guilty by reason of insanity, to compel production of the initial offense report, for a speedy trial, for discovery, for the production of <u>Brady</u> material, for reduction of the petitioner's bond, and to subpoena investigatory materials from the Glen Oaks High

School.  On March 11, 1992, the trial court appointed a sanity commission to determine the petitioner's competence to stand trial and, apparently, to attempt to determine sanity at the time of the offense.  On April 1, 1992, hearings were conducted and evidence was adduced in connection with the referenced motions, and a second attorney, Mark Marinoff, enrolled as additional counsel on the petitioner's behalf.  After rulings on the referenced motions were had, attorney Monahan filed several additional motions, including (1) on April 24, 1992, a motion for a writ of review in the First Circuit appellate court and a motion to suppress statements made by the petitioner (in connection with which an evidentiary hearing was conducted on May 14, 1992), (2) on May 27, 1992, a motion for individualized voir dire and a motion to use a "veniremen questionnaire", and (3) on June 1, 1992, a motion for a change of venue due to adverse publicity.

The trial commenced on June 1, 1992, as scheduled, and attorneys Monahan and Marinoff conducted a vigorous voir dire examination of the prospective jurors (including a <u>Batson</u> challenge to the State's alleged racially-motivated use of peremptory challenges).  Upon a jury being empaneled on June 2, 1992, the trial proceeded, and on June 4, 1992, the petitioner was found guilty as charged.  During the trial, much bickering and acrimony occurred between the petitioner's attorneys and the attorney for the State, and attorney Monahan twice moved for a mistrial, once in connection with alleged prosecutorial misconduct during the State's opening statement and once in connection with an alleged sequestration violation by a witness.  Both of these motions were denied by the trial judge.

Prior to the petitioner's indictment, and apparently unbeknownst to the petitioner and his family, attorney Monahan became the target, in 1991, of a drug trafficking investigation by federal and state officials.  This investigation culminated in a federal indictment in February , 1992, and on March 26, 1992, attorney Monahan entered into a plea agreement with federal officials whereby he agreed to plead guilty to one count of knowingly and intentionally aiding and abetting another to possess with intent to distribute and to distribute cocaine, a violation of 21 U.S.C. § 841(a)(1).  In

connection with this plea agreement, attorney Monahan further agreed to provide complete and truthful information to federal officials in connection with the investigation. In exchange, the Government agreed to a sentence of thirty-three (33) months in confinement, together with a monetary fine in an unstated amount. A subsequent letter from the Louisiana District Attorney's Office, dated March 31, 1992, indicated an understanding that attorney Monahan's anticipated plea to related state charges would result in a concurrent state sentence no greater than that imposed in connection with the federal charges. Thus, as of March 31, 1992, more than two months prior to the petitioner's trial, attorney Monahan had in place an agreement with respect to the pending criminal investigation, with both federal and state officials, as to the sentence he would receive in connection with the investigation and charges.

Post-Trial Proceedings

Upon conclusion of the jury trial, in June, 1992, the petitioner was sentenced to life imprisonment, without the benefit of probation, parole or suspension of sentence. In March, 1993, the petitioner appealed this conviction, ultimately urging twelve (12) assignments of error. The conviction was affirmed by the Louisiana Court of Appeal for the First Circuit on June 24, 1994, and on April 4, 1997, the petitioner's application for supervisory review in the Louisiana Supreme Court was denied. See State v. Hall, 692 So.2d 413 (La. 1997).

Upon conclusion of direct criminal appeal proceedings, the petitioner filed an application for post-conviction relief in the state district court, raising the four (4) claims which were originally asserted in this proceeding. This application was denied in the state district court on August 22, 1997, and an application for supervisory review was subsequently denied by the intermediate appellate court on March 6, 1998. Although the Louisiana Supreme Court initially relied on procedural grounds in denying the petitioner's application for supervisory review in that court, State ex rel. Hall v. State, 726 So.2d 37 (La. 1998) -- finding that the petitioner's application was untimely under state law -- the petitioner thereafter filed a motion to reconsider, which the Supreme Court

apparently substantively addressed. As a result, on November 20, 1998, the Supreme Court issued a ruling, "reconsideration denied on the merits". <u>See</u> <u>State ex rel. Hall v. State</u>, 728 So.2d 880 (La. 1998).

As previously noted, the petitioner's initial application for federal habeas review was originally denied in this Court but was thereafter remanded for a determination regarding the petitioner's request for leave to amend his application to allege specific deficient performance by his trial counsel and actual prejudice resulting from such deficient performance. After such remand, this Court appointed counsel to represent the petitioner, authorized limited discovery, and approved investigatory funds for the purpose of developing the referenced claim. The petitioner was allowed to file detailed first amended and second amended applications, wherein he set forth the factual basis for his claim that he was provided with ineffective assistance of counsel because of his trial attorney's conflict of interest and that he suffered actual prejudice as a result of the deficient performance. The State of Louisiana filed responses to the first and second amended applications, which this Court construes as motions to dismiss. <u>See</u>, <u>e.g.</u>, <u>Clark v. Quarterman</u>, 2008 WL 2599997 (W.D. Tex., June 26, 2008) (interpreting answer to habeas corpus application as motion to dismiss); <u>Williams v. Cockrell</u>, 2003 WL 21246132 (N.D. Tex., April 18, 2003) (same). The State contends that several of the claims asserted in the second amended application are not properly before this Court and that, as to the remaining claims, a deferential review of the state court proceedings and findings, as mandated by 28 U.S.C. § 2254(d) and (e), compels the conclusion that the petitioner's claims must be rejected.

<u>LEGAL ANALYSIS</u>

<u>The Petitioner's Initial Assertion That He Need Not Meet The Two-Prong Test
Of Strickland V. Washington Is Foreclosed By This Court's Prior Ruling</u>

Initially, the petitioner seeks to revisit his argument that he need not establish the two prong test of the <u>Strickland</u> analysis -- deficient performance and prejudice in fact -- because he contends

that the situation which existed between himself and his attorney created an "actual conflict" of interest which was of sufficient magnitude to necessitate a presumption of prejudice. See Cuyler v. Sullivan, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). Notwithstanding, this Court has previously addressed this argument, in its initial Report and Recommendation in this case, rec.doc.no. 20, and concluded that, in the absence of a claim that his attorney's conflict of interest resulted from multiple or successive representations of criminal defendants with potentially competing claims and defenses, as was presented in Cuyler, supra, the petitioner is required to establish both deficient performance and actual prejudice resulting from the alleged conflict. See Mickens v. Taylor, 535 U.S. 162, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002) (noting that "the language of [Cuyler v.] Sullivan itself does not clearly establish, or indeed even support," an expansion of the automatic reversal standard to other types of ethical conflicts). On appeal, this issue was squarely presented to the Fifth Circuit, with the petitioner arguing before that Court that "the district court applied the wrong standard to his ineffective-assistance claim", see Order of the United States Court of Appeals for the Fifth Circuit dated November 2, 2004. The Fifth Circuit Court, however, refused to address this issue or to grant a Certificate of Appealability in connection therewith, concluding that the petitioner had failed to show "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Id. Accordingly, inasmuch as this Court's determination has been implicitly upheld on appeal by the United States Court of Appeals for the Fifth Circuit, this Court will not again address the petitioner's argument in this regard. In fact, even the petitioner, in his Second Amended Petition, concedes "that this claim is unavailable under this Court's and the Fifth Circuit's holding" and that he is raising it herein "in order to preserve a challenge to this Court and the Fifth Circuit's rulings." See rec.doc.no. 74 at note 17.

The Petitioner's Claims, Other Than That Attorney Monahan
Failed To Investigate And Present Evidence At Trial And Failed
To Pursue An Insanity Defense, Do Not Relate Back To The Filing
Of The Original Petition And So Are Not Properly Before The Court

Turning to the petitioner's arguments regarding the specific alleged deficient performance of attorney Monahan, the petitioner focuses upon three central assertions. Specifically, the petitioner asserts that attorney Monahan (1) failed to conduct an adequate investigation so as to be able to effectively present a defense supporting a conviction of manslaughter instead of second degree murder, (2) failed to place adequate pressure upon the State for the production of exculpatory evidence under Brady v. Maryland,[1] and (3) failed to subject the State's case to meaningful adversarial testing. As discussed below, the Court concludes initially that only the first of these claims above, that attorney Monahan failed to investigate and present evidence at trial, is properly before this Court. In addition, although the petitioner's Second Amended Petition does not explicitly assert a claim regarding attorney Monahan's decision to withdraw the petitioner's plea of not guilty by reason of insanity, the Court will address this claim as well inasmuch as it is referred to in the Second Amended Petition, inasmuch as it was asserted in the petitioner's original application for habeas relief in this Court, and inasmuch as it tangentially relates to the petitioner's claim regarding the presentation of evidence supporting a manslaughter conviction.

Pursuant to 28 U.S.C. § 2244(d), a prisoner in custody is required to file his application for habeas corpus relief within one year of the finality of his conviction, not counting the time during which he has pending before the state courts any properly filed application for post-conviction or other collateral relief. In the instant case, the petitioner filed a timely original application for habeas corpus relief in this Court. Thereafter, long after the expiration of the one-year limitations period and after the issuance of a Magistrate Judge's Report which recommended dismissal of the petitioner's claims, he filed an Objection thereto and a Motion for Rule 59(e) Relief, which the United States Court of Appeals for the Fifth Circuit interpreted to be a request for leave to amend his application. The question, therefore, is whether the new claims submitted by the petitioner in

---

[1]     373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

his initial request for leave to amend, as well as the new claims submitted by the petitioner in his two (2) counseled amended petitions, relate back to the filing of his original, timely, application for habeas corpus in this Court.

Pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure, which applies in habeas corpus proceedings, United States v. Saenz, 282 F.3d 354 (5th Cir. 2002), leave to amend should be freely granted by the courts. Pursuant to Rule 15(c)(1)(B), an amendment to a pleading relates back to the date of the original pleading when "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading." In United States v. Gonzalez, 592 F.3d 675 (5th Cir. 2009), cert. denied, 131 S.Ct. 231, 178 L.Ed.2d 153 (2010), the Fifth Circuit addressed the question whether a petitioner's amended petition for habeas corpus relief, which asserted new and different instances of alleged ineffective assistance of counsel than those asserted in his timely original petition, related back to the filing of the original petition. The Court concluded that it did not. In doing so, the Court noted the recent United States Supreme Court decision of Mayle v. Felix, 545 U.S. 644, 125 S.Ct. 2562, 162 L.Ed.2d 582 (2005), which held that claims asserted in an amendment to a habeas petition do not automatically relate back merely because they arise out of the same trial and conviction, and that amendments do not relate back if they assert "a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." Id. The Fifth Circuit in Gonzalez then examined the approach taken by other Circuits when addressing new ineffective assistance claims asserted in untimely amended habeas petitions and noted that both the First and Eighth Circuits have interpreted Mayle to preclude the raising of new claims of ineffective assistance in such petitions. For example, in United States v. Ciampi, 419 F.3d 20 (1st Cir.), cert. denied, 547 U.S. 1217, 126 S.Ct. 2906, 165 L.Ed.2d 936 (2006). the First Circuit applied Mayle's "stringent standard" and held that a claim of ineffective assistance arising out of an attorney's alleged failure to discuss the petitioner's appellate rights with him did not relate back to his original

claim dealing with the attorney's advice to accept a plea bargain. Id. ("[A] petitioner does not satisfy the Rule 15 'relation back' standard merely by raising some type of ineffective assistance in the original petition, and then amending the petition to assert another ineffective assistance claim based upon an entirely distinct type of attorney malfeasance."). See also United States v. Hernandez, 436 F.3d 851 (8th Cir.), cert. denied, 547 U.S. 1172, 126 S.Ct. 2341, 164 L.Ed.2d 856 (2006) (holding that claims relating to an attorney's failure to cross-examine two witnesses and those relating to the attorney's failure to object to evidence were "not similar enough to satisfy the 'time and type test' espoused in Mayle"). Finally, the Fifth Circuit noted that several other Circuits, in cases decided before the Mayle decision, had reached the same conclusion. See Davenport v. United States, 217 F.3d 1341 (11th Cir. 2000), cert. denied, 532 U.S. 907, 121 S.Ct. 1232, 149 L.Ed.2d 141 (2001) (holding that a petitioner's claim that his counsel failed to inform him of a possible plea agreement did not relate back to his original claim that his attorney failed to challenge the chemical composition of the crack cocaine he was charged with possessing); United States v. Duffus, 174 F.3d 333 (3rd Cir.), cert. denied, 528 U.S. 866, 120 S.Ct. 163, 145 L.Ed.2d 138 (1999) (holding that a petitioner's amended claim of ineffective assistance due to his attorney's failure to move to suppress evidence did not relate back to his original claim that his attorney failed to raise an issue on appeal). Based upon these decisions, the Fifth Circuit adopted the approach taken by these other Circuits and concluded that "[n]ew claims of ineffective assistance of counsel do not automatically relate back to prior ineffective assistance claims simply because they violate the same constitutional provision," i.e., the right to effective legal representation under the Sixth and Fourteenth Amendments. United States v. Gonzalez, supra. Instead, the Court determined that it must look to whether the out-of-time amendment asserts "'a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth.'" Id. (quoting Mayle v. Felix, supra). If the amendment asserts such a new claim, then the amendment does not relate back to the original petition and is time-barred.

In his original application for habeas corpus relief in this Court, the petitioner asserted that his trial attorney provided generalized ineffective assistance of counsel because of an actual conflict of interest which affected the course of trial. However, because the petitioner erroneously believed and argued that he was not legally required to specifically delineate the nature of the deficient performance, or actual prejudice resulting therefrom, he made no real attempt to identify same. Instead, the most that the petitioner asserted in the original petition, broadly and liberally interpreted, was that as a result of his attorney's deficient performance, "[a]ll of the facts of this case were not clearly brought out before the trial court," and "better investigation would have brought forth a different verdict." See rec.doc.no. 2 at p. 16. In addition, the petitioner's original timely application may be interpreted as specifically complaining that his trial attorney (1) abandoned an issue regarding the petitioner's competency and (2) effectively acquiesced in shifting to the defense the burden of establishing a manslaughter defense. This is the most which may be gleaned from the petitioner's original application relative to his attorney's alleged deficient performance.

In his first pro se attempts to amend his petition, filed long after the expiration of the one-year time limit, the petitioner sought to elaborate on his claim relative to attorney Monahan's failure to investigate and present evidence at trial by referring specifically to nine (9) witnesses who allegedly would have substantiated the petitioner's claim of self-defense and/or supported a manslaughter verdict. See Petitioner's Objection to the Magistrate's Report and Recommendation, rec.doc.no. 24, and Rule 59(e) Motion to Alter or Amend the Judgment, rec.doc.no. 21. In the latter motion, the petitioner also sought to assert claims relative to attorney Monahan's alleged failure to effectively cross-examine the State's witnesses, to present enlarged photographs of the crime scene and adjacent areas, to secure a favorable plea agreement, and to return critical documents after trial. In his counseled First and Second Amended Petitions, which have effectively

superceded the initial pro se filings,[2] the petitioner now essentially focuses upon three areas of alleged deficiency, (1) attorney Monahan's failure to adequately prepare, to fully investigate, and to call witnesses favorable to the petitioner, (2) his failure to pursue the production of exculpatory evidence in the possession of the prosecution, and (3) his failure to subject the State's case to meaningful adversarial testing, including acquiescing in meritless objections by the prosecution, failing to object to irrelevant witness testimony and improper prosecutorial commentary and colloquy, failing to object to the admission into evidence of gruesome photographs, failing to object to hearsay expert testimony which violated the petitioner's confrontation rights, and making the decision to enter into an agreement with the prosecution for neither attorney to object to the closing argument of the other.

Based upon the above recitation, the Court concludes that, of the many new fact-based claims asserted in the petitioner's amended petition, only his claims regarding (1) the failure to investigate and call witnesses favorable to the defense, and (2) the decision to withdraw an insanity defense are properly before the Court. Broadly interpreted, the petitioner's original timely application referred only to these two claims now sought to be asserted. Specifically, and giving the petitioner broad latitude, his assertion in the original application that "all of the facts of this case were not clearly brought out," that "better investigation would have brought forth a different verdict", and that his attorney withdrew an insanity defense, are sufficiently factually similar, "in both time and type," to the claims now asserted regarding attorney Monahan's alleged failure to investigate and call witnesses and failure to pursue the insanity defense, as to support allowing these claims to now be presented. Mayle v. Felix, supra. The remaining claims, however, which include specific alleged instances of failing to aggressively pursue Brady evidence, of failing to make specific

---

[2]     An amending Complaint which does not explicitly incorporate or adopt the provisions of an original Complaint is normally deemed to supercede the original Complaint and to render the original Complaint of no legal effect. See, e.g., Stewart v. City of Houston Police Department, 2010 WL 1286925 (5th Cir., March 30, 2010), citing King v. Dogan, 31 F.3d 344 (5th Cir. 1994).

objections to colloquy, testimony and evidence, and of entering into an agreement with the prosecution regarding closing arguments, were nowhere asserted in the original application, even applying the most liberal interpretation thereof.  Specifically, there is no liberal reading of the original state or federal habeas applications which can be found to have placed the State on notice of the factual basis for these newly asserted claims.  See United States v. Hernandez, 436 F.3d 851 (8th Cir.), cert. denied, 547 U.S. 1172, 126 S.Ct. 2341, 164 L.Ed.2d 856 (2006) (holding that new legal theories may be asserted in an amended application only if the new claims arise out of the same set of facts as the original claims and only if such facts were specific enough to put the opposing party on notice of the factual basis for the claims).  Instead, by relying solely upon his erroneous legal conclusion that, because of the conflict of interest, he need not specifically identify any actual deficient performance of his trial counsel or any resulting prejudice, the petitioner made no effort to identify any such instances of performance (other than the two above-noted), and provided no "core of operative facts" from which the newly added instances of attorney misconduct may be gleaned.  Nor does the Court interpret the petitioner's factual allegation regarding the mere existence of the alleged conflict, and it's supposed effect upon every aspect of the trial, to be sufficient to constitute a core of operative fact to which all later-identified instances of attorney misconduct may be appended.  Were this allowed, then any broad-based generalized allegation of attorney disqualification asserted in an original habeas application – illness, alcoholism, drug addiction, age, etc. – would open the door to later untimely amendments detailing all manner of specific instances of misconduct.  This Court does not interpret Mayle v. Felix to allow relation back in such instance, and the Court will not allow it here.

Further, although the petitioner argues that the issue of the relation back of the claims asserted in the Second Amended Petition has been waived by the State, the Court does not agree. Upon remand of this case from the Fifth Circuit, the petitioner moved for appointment of counsel, which motion was granted by the Court, and the Court allowed the petitioner a period of thirty days

within which to file a motion for leave to amend the petition.  See rec.doc.no. 41.  The Court's Order further directed "counsel to provide a memorandum addressing the effect, if any, which the Supreme Court decision in Mayle v. Felix ... may have on the proposed amendment."  Id.  The Court did not state in the referenced Order that the State was required to respond to the petitioner's motion for leave to amend or address, at that juncture, the Mayle relation-back issue.  Thereafter, upon the petitioner's filing of a motion for leave to amend, the Court granted the motion, rec.doc.no. 49, and also granted leave to the petitioner to engage in limited discovery, rec.doc.no. 50.  The Court further ruled that, "during the time that any discovery is ongoing, the State of Louisiana need not respond to the allegations, assertions and arguments contained in the petitioner's Amended Petition for Writ of Habeas Corpus."  Id.  Nonetheless, the State thereafter filed an Answer and Memorandum in opposition to the petitioner's First Amended Petition, see rec.doc.nos. 63 and 64, and asserted therein that the new claims asserted in the petitioner's First Amended Petition were untimely because they did not relate back to the original petition under Mayle v. Felix.  Thereafter, upon the conclusion of discovery, the Court granted the petitioner leave to file a Second Amended Petition which is currently before the Court.  See rec.doc.no. 74.  In response to this Second Amended Petition, the State has again filed an Answer, rec.doc.no. 82 , and in this Answer, the State contends, once again, that the petitioner's "new factual allegations ... should not be considered by this district court."  Although the State does not explicitly cite the Mayle v. Felix decision in making this assertion, the Court does not deem such failure to be fatal to a consideration of this issue, particularly where the State has raised and argued the issue of the relation back of the petitioner's new claims, and the Court has not previously made a ruling in connection therewith.  Moreover, the Court notes that it is authorized to raise the issue of untimeliness sua sponte when the resolution of the issue is clear on the face of the record.  Day v. McDonough, 547 U.S. 198, 126 S.Ct. 1675, 164 L.Ed.2d 376 (2006).

Further, although this Court has the power to equitably toll the statute of limitations under

13

certain circumstances, Davis v. Johnson, 158 F.3d 806 (5th Cir. 1998), cert. denied, 526 U.S. 1074, 119 S.Ct. 1474, 143 L.Ed.2d 558 (1999), this Court finds no compelling reason to recommend tolling in this case. Equitable tolling is permitted only "in rare and exceptional circumstances". Davis v. Johnson, supra; Coleman v. Johnson, 184 F.3d 398 (5th Cir. 1999), cert. denied, 529 U.S. 1057, 120 S.Ct. 1564, 146 L.Ed.2d 467 (2000). The doctrine "applies principally where the plaintiff is actively misled ... about the cause of action or is prevented in some extraordinary way from asserting his rights." Coker v. Quarterman, 270 Fed.Appx. 305 (5th Cir. 2008). It has been consistently held that the petitioner bears the burden of proving equitable tolling in this context. Coker, supra, citing Phillips v. Donnelly, 216 F.3d 508 (5th Cir.), modified on reh'g, 223 F.3d 797 (5th Cir. 2000) (holding that the petitioner bears the burden of proving the factual predicates warranting equitable tolling); Alexander v. Cockrell, 294 F.3d 626 (5th Cir. 2002) (same). Further, the petitioner is required to show that he has diligently pursued his rights. Holland v. Florida, 130 S.Ct. 2549, 177 L.Ed.2d 130 (2010). Finally, a petitioner's ignorance or misinterpretation of the law, "however understandable", rarely qualifies as extraordinary circumstances. Flores v. Quarterman, 467 F.3d 484 (5th Cir. 2006), cert. denied, 551 U.S. 1102, 127 S.Ct. 2909, 168 L.Ed.2d 242 (2007) (finding no equitable tolling where petitioner misinterpreted the manner in which unsettled law would ultimately be decided as to the proper date of filing). See also Fierro v. Cockrell, 294 F.3d 674 (5th Cir. 2002), cert. denied, 538 U.S. 947, 123 S.Ct. 1621, 155 L.Ed.2d 489 (2003) (holding that "lack of knowledge of the law, however understandable it may be, does not ordinarily justify equitable tolling."); Fisher v. Johnson, 174 F.3d 710 (5th Cir.), cert. denied, 531 U.S. 1164, 121 S.Ct. 1124, 148 L.Ed.2d 991 (2001) ("ignorance of the law, even for an incarcerated pro se petitioner, generally does not excuse prompt filing.").

In the instant case, the petitioner has pointed to no facts which might warrant the application of equitable tolling in this case. To the contrary, it appears that his failure to set forth in his initial application, with particularity, the deficient performance of his trial counsel and the nature of the

resulting prejudice was attributable to his mistaken belief that he was not required to do so. See Fierro v. Cockrell, supra. There were no other extraordinary circumstances which prevented him from setting forth these claims in a timely petition. Accordingly, the Court concludes that he is not entitled to equitable tolling in this case.[3]

### Substantive Review Of The Petitioner's Claims

Turning to a substantive review of the petitioner's claims which are properly before the Court, the standard of review applicable to a writ of habeas corpus in this Court is that set forth in 28 U.S.C. § 2254. Specifically relevant is 28 U.S.C. § 2254(d)(1), which provides that an application for a writ of habeas corpus shall not be granted with respect to any claim that a state court has adjudicated on the merits unless the adjudication has "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." See also Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). Relief is authorized if a state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Relief is also available if the state court identifies the correct legal principle but unreasonably applies that principle to the facts of the prisoner's case or reaches a decision based on an unreasonable factual determination. See 28 U.S.C. § 2254(d)(1)-(2);

---

[3]     The Court further notes that, as argued in the State's Answer to the petitioner's First Amended Petition, see rec.doc.no. 64, the petitioner's new fact-based claims regarding specific instances of attorney Monahan's deficient performance have never been presented to the state courts. As a result, these claims are technically exhausted but procedurally defaulted because "the [state] court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." Nobles v. Johnson, 127 F.3d 409 (5th Cir. 1997), cert. denied, 523 U.S. 1139, 118 S.Ct. 1845, 140 L.Ed.2d 1094 (1998), quoting Coleman v. Thompson, 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

Montoya v. Johnson, 226 F.3d 399 (5th Cir. 2000), cert. denied, 532 U.S. 1067, 121 S.Ct. 2220, 150 L.Ed.2d 212 (2001). Mere disagreement with the state court is not enough: The standard is one of objective reasonableness. Montoya, supra, 226 F.3d at 404. See also Williams v. Taylor, supra, 529 U.S. at 409, 120 S.Ct. at 1521 (2000)("[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable"). State court determinations of underlying factual issues are presumed correct, and the petitioner has the burden to rebut the presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

The issue before this Court is whether the petitioner was provided with ineffective assistance of counsel in the two specific instances addressed above (failure to investigate and present evidence at trial and failure to pursue an insanity defense) because his lead trial attorney, Robert Monahan, was at the time of trial himself under criminal indictment for drug violations and had negotiated a plea agreement with state and federal authorities. The petitioner contends that this situation placed his trial counsel in a position of divided loyalty which resulted in prejudice to the defense.

As a general rule, a habeas petitioner who claims ineffective assistance of counsel must affirmatively demonstrate:

(1)     That his counsel's performance was "deficient", i.e., that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the petitioner by the Sixth Amendment; and

(2)     That the deficient performance prejudiced his defense, i.e., that counsel"s errors were so serious as to deprive the petitioner of a fair trial, a trial in which the result is reliable.

Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The petitioner must make both showings in order to obtain habeas relief based upon the alleged ineffective assistance of counsel. Id. To satisfy the deficiency prong of the Strickland standard, the petitioner must demonstrate that his counsel's representation fell below an objective standard of

reasonableness as measured by prevailing professional standards.  See, e.g., Martin v. McCotter, 796 F.2d 813 (5th Cir. 1986), cert. denied, 479 U.S. 1057, 107 S.Ct. 935, 93 L.Ed.2d 985 (1987). The reviewing court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional competence and that, under the circumstances, the challenged action might be considered sound trial strategy.  See, e.g., Bridge v. Lynaugh, 838 F.2d 770 (5th Cir. 1988).  This Court, therefore, must make every effort to eliminate the distorting effects of hindsight and to evaluate the conduct from counsel's perspective at the time of trial.  Martin, supra, 796 F.2d at 817.  Great deference is given to counsel's exercise of his professional judgment.  Bridge, supra, 838 F.2d at 773; Martin, supra, 796 F.2d at 816.

If the petitioner satisfies the first prong of the Strickland test, his petition nonetheless must affirmatively demonstrate prejudice resulting from the alleged errors.  Earvin v. Lynaugh, 860 F.2d 623 (5th Cir. 1988), cert. denied, 489 U.S. 1091, 109 S.Ct. 1558, 103 L.Ed.2d 861 (1989).  To satisfy the prejudice prong of the Strickland test, it is not sufficient for the petitioner to show that the alleged errors had some conceivable effect on the outcome of the proceeding.  Strickland, supra, 466 U.S. at 693, 104 S.Ct. at 2067.  Rather, the petitioner must show a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.  Martin, supra, 796 F.2d at 816.  The habeas petitioner need not show that his counsel's alleged errors "more likely than not" altered the outcome of the case, but he must show a probability that the errors are "sufficient to undermine confidence in the outcome."  Id. at 816-17.

### Alleged Failure To Investigate And Present Witnesses

In order to address this claim, it is appropriate to review the evidence presented at the petitioner's trial.  The undisputed evidence at trial reflected that the petitioner arrived at his high school on the morning of Monday, February 17, 1992, and proceeded to an area of the school walkway where students were arriving and entering the school grounds.  A short while later, the decedent arrived at school with several friends and proceeded down the walkway.  Inasmuch as

17

there had been conflict between the petitioner and the decedent in the days or weeks preceding this morning, the two students noticed each other, and the decedent's friends pointed out the petitioner on the walkway.  It is undisputed, however, that no words were exchanged between the antagonists, although the petitioner testified that he heard one of the decedent's friends say that this was going to be the petitioner's last day.  It is also undisputed that no threatening gestures were made.  In fact, it appears that the decedent and his friends passed the petitioner on the walkway without overt incident.  Immediately after the decedent passed, however, the petitioner took a semi-automatic .380 caliber handgun from his backpack, stepped up behind the decedent and fired a single fatal shot into the back of the decedent's head.

In addition to the foregoing, the State adduced testimony from witnesses that, at the bus stop earlier that morning, the petitioner was overheard by a fellow student saying that he "was going to get somebody" that morning and that people were going to "hear about it on the news" (Tr. Record at p. 641).  Once on the bus, the petitioner was also overheard stating that "it's been fun living in the 'hood with ya'll but I'm going to parish today" (Tr. Record at p. 647), which the witness understood to mean parish prison.  In addition, the petitioner showed another student a .380 caliber bullet on the bus and told the student to look at it because "it might be a souvenir". (Tr. Record at p. 961-62).

The State also adduced testimony that, upon arrival at school, and after the petitioner proceeded to the area of the walkway as above indicated, he was observed pacing and talking to himself.  One witness overheard the petitioner saying to himself at that time that he was "going to be famous" and that people were "going to read about it" (Tr. Record at p. 632).  The petitioner was also observed raising up on his toes and craning his neck to observe students as they arrived at school, apparently looking for someone.

Several witnesses testified regarding the actions of the petitioner immediately after the shooting.  One eyewitness testified that the petitioner stood over the fallen victim and said "I told

you I'm going to get you" (Tr. Record at p. 603), and another testified that the petitioner stated, "Yeah, bitch, I got mine, you dead, I got mine, that's how we handle out business" (Tr. Record at p. 658). After the shooting, the petitioner apparently departed the scene for a few seconds, apparently to dispose of the weapon by giving it to a friend. He returned shortly thereafter and waited for the arrival of school officials and police officers. He then admitted to a school official that he had shot the decedent, and he gave a further statement to a police officer while being transported to the station wherein he admitted that, because of repeated threats from the decedent – to the effect that the decedent was "going to get him" – the petitioner admittedly "got scared so he went and got a gun and brought it to school and shot him" (Tr. Record at p. 780).

In order to counteract the overwhelming damaging effect of the above-related testimony, the petitioner's attorneys focused on the nature and extent of the conflict and escalating threats which took place over a period of several days or weeks preceding the shooting. In this regard, attorney Monahan elicited testimony on cross-examination from several of the State's witnesses that the petitioner and the victim had been engaged in a dispute which was likely leading up to a fight between the antagonists. Specifically, attorney Monahan elicited testimony from fellow students that the petitioner and the decedent were rumored to not be "getting along" (Tr. Record at p. 654), were "having kind of a feud" (Tr. Record at p. 692), were "supposed to fight" (Tr. Record at p. 618), and were "fixing to fight" (Tr. Record at p. 618-19). Although the State's witnesses generally testified that they were not aware of any specific threats made by the decedent against the petitioner, and that the two antagonists "just wanted to settle something, fight each other or something" (Tr. Record at p. 698), the defense called four witnesses to the stand, as well as the petitioner, who provided a more detailed picture regarding escalating threats of violence between the parties. These witnesses clarified that the dispute between the petitioner and the decedent had originated several days or weeks previously when the petitioner was observed speaking to the decedent's ex-girlfriend, Charlene Jones, after school one day. After this incident, the decedent

became antagonistic, but according to Ms. Jones, both parties were involved, " pretty much back and forth at it" (Tr. Record at p. 875), and "they was threatening each other (Tr. Record at p. 880). According to the petitioner, on the Thursday preceding the Monday shooting, a fellow student warned the petitioner not to go through a certain doorway at school because the decedent and a group of friends were waiting on the other side to "jump on" the petitioner. The petitioner confirmed this fact by circling around and observing the petitioner and several friends waiting on the other side of the referenced doorway. When the petitioner approached the decedent later in the day to ask what the problem was, the decedent reportedly responded that there wasn't anything to say about it and that the petitioner should "get out of [his] face" (Tr. Record at p. 915). The next morning, Friday, the petitioner reportedly approached the decedent and attempted to amicably resolve the dispute. According to one witness, Keith Ginn, a friend of the decedent, the parties shook hands at that time, and the matter was ostensibly settled. (Tr. Record at p. 731). Later in the day, however, hostilities apparently resumed. In addition, the decedent was involved in a dispute with Charlene Jones which ended with the decedent slapping Ms. Jones in the face and being sent to the principal's office.

Finally, during the weekend prior to the shooting, Charlene Jones and another friend, Jennifer Scott, learned from the decedent's younger brother, Shyrone Wells, that the decedent planned to come to school with a gun on Monday, and that a plan had been developed whereby the decedent's brother was to punch the petitioner in the face, after which the decedent was to shoot the petitioner. In addition, Ms. Jones learned from the decedent that he planned to drive by the petitioner's house and shoot up the petitioner's house with the petitioner and his family inside. Ms. Jones was aware that both the decedent and petitioner possessed guns because the decedent had showed one to her and the petitioner had told her so. According to the petitioner, both Charlene Jones and Jennifer Scott communicated these threats to the petitioner, whereas Ms. Jones testified that she only told Jennifer Scott of the threats, who relayed them to the petitioner.

20

Ms. Jones further testified that she spent the weekend trying to convince both parties to drop their dispute, but they both said that they planned to "handle their business". (Tr. Record at pp. 868, 872). According to the petitioner, Ms. Jones advised him that she had even offered money to the decedent to refrain from the planned attack on Monday, but the decedent refused, saying that he "had to get" the petitioner. (Tr. Record at p. 919). Ms. Jones further testified that during her last conversation with the petitioner, on the night before the shooting, the petitioner stated that he did not want to fight the decedent but that he was "going to take care of business." (Tr. Record at pp. 884-85).

The petitioner himself testified that, as the weekend progressed, he became more and more scared and frantic. When he learned of the decedent's plan to shoot up his house, he felt "great concern for [his] life and the life of family members." (Tr. Record at p. 917). He spoke with his uncle, Troy Dupree, on Sunday, who testified that the petitioner expressed worry because the decedent and some friends had been picking on him and were planning to jump on him. The petitioner became even more scared that night when he observed, as corroborated by Jennifer Scott, an unfamiliar vehicle slowly and repeatedly circling the block in front of his house. The petitioner's state of mind was further frayed on the night before the shooting because his aunt fell and broke her arm that evening, and the petitioner spent the entire night driving to the hospital, caring for his aunt, and driving her home after her discharge. According to the petitioner, he didn't return home until approximately 5:45 a.m. on the morning of the shooting and was only briefly able to nap before getting ready for school.

Finally, the petitioner testified that on the morning of the shooting, just before he left his house, he received a telephone call. The caller, whose voice sounded like that of the decedent, stated to the petitioner that, "this is you and your family's last day", and hung up. According to the petitioner, this was "one of the most feared moments of [his] life", and he entered into "a somewhat unconscious state of mind". (Tr. Record at p. 922). He denied, however, that he took a gun or

ammunition to school or that he said anything at the bus stop, on the bus, or at school about getting somebody that day, about being famous, about going to "parish", or about people hearing or reading about him on the news. Instead, he arrived at school and was standing on the school walkway when he saw the decedent and several friends approaching. He testified that his fear began to grow because he knew that they were planning to get him that day. He heard somebody say, "today's your last day" as the group approached, and he reached into his backpack to retrieve a gun which his friend Ramon Payton had placed there. He testified that, immediately before the shooting, he saw something shiny in the hand of one member of the group, which he believed to be "brass knuckles". He acknowledged, however, that he never saw a weapon in the decedent's hands and that the group had passed him on the walkway and were walking away when the shot was fired. The petitioner explicitly denied standing over the decedent's body and making any bragging, boasting or taunting words or gestures after the shooting.

A habeas petitioner "who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." Gregory v. Thaler, 601 F.3d 347 (5th Cir.), cert. denied, 131 U.S. 265, 178 S.Ct. 175, 178 L.Ed.2d 175 (2010), quoting United States v. Green, 882 F.2d 999 (5th Cir. 1989). To prevail on a claim based upon uncalled witnesses, a petitioner must name the witness, demonstrate that the witness was available and would have testified, set out the content of the witness' proposed testimony, and show that the testimony would have been favorable. Id. Claims of uncalled witnesses are disfavored, especially if the claim is unsupported by evidence, in the form of affidavits, indicating the witness' willingness to testify and the substance of the proposed testimony. See Harrison v. Quarterman, 496 F.3d 419 (5th Cir. 2007) ("Ordinarily, a defendant's failure to present some evidence from the uncalled witness ... would be fatal to an ineffective assistance of counsel claim."). See also Alexander v. McCotter, 775 F.2d 595 (5th Cir. 1985). Where the only evidence of a missing witness' testimony is provided by the habeas petitioner,

22

federal courts view his claims with great caution. <u>Lockhart v. McCotter</u>, 782 F.2d 1275 (5th Cir. 1986), <u>cert. denied</u>, 479 U.S. 1030, 107 S.Ct. 873, 93 L.Ed.2d 827 (1987). Further, "the presentation of witness testimony is essentially strategy and thus with the trial counsel's domain." <u>Alexander v. McCotter</u>, <u>supra</u>.

In the instant case, the petitioner wholly failed to produce any affidavits or other evidence before the state trial court, and has failed to do so in this Court, identifying the substance of any proposed testimony from uncalled witnesses. All that the petitioner has done, even with time and with Court-provided funds for investigation, is furnish brief and unsupported assertions with regard to the testimony that certain identified witnesses may have provided had they been called. And even were the petitioner to provide such affidavits at the present time, the Court would likely find them to be not properly before the Court. <u>See</u> <u>Pierce v. Thaler</u>, 355 Fed.Appx 784 (5th Cir. 2009) (finding that affidavits which were provided for the first time on federal habeas review and had not been provided before the State courts could not be considered). <u>See also</u> <u>Cullen v. Pinholster</u>, 131 S.Ct. 1388 (2011) (holding that federal habeas corpus review is "limited to the record that was before the state court that adjudicated the claim on the merits"). Accordingly, his claim of ineffective assistance of counsel in this regard must fail.[4]

Further, even were the Court to accept the petitioner's unsupported and unsubstantiated assertions, made for the first time in this Court and then only after the issuance of a Magistrate Judge's Report rejecting his claims, that certain witnesses, nine (9) in number, should have been called at trial to bolster his defense, the Court nonetheless concludes that the testimony purportedly

---

[4] The Court further notes that the petitioner's complaint that he was provided with ineffective assistance of counsel – because of attorney Monahan's conflict of interest – completely overlooks the fact that the plaintiff had the assistance of two attorneys at trial, one of whom participated actively at trial and was not laboring under the alleged conflict of interest. Specifically, attorney Mark Marinoff enrolled as co-counsel on the petitioner's behalf on April 1, 1992, participated actively in voir dire proceedings, cross-examined five (5) of the State's twelve (12) witnesses, and conducted the questioning of the petitioner of re-direct examination.

to be provided by these witnesses would not likely have altered the result of the trial. Attorney Monahan presented to the jury, through both cross-examination and through direct testimony, testimony showing that the petitioner and the victim had been involved in a dispute in the days or weeks preceding the shooting, and that a fight of some kind was anticipated, both by the parties themselves and by fellow students. Testimony was further presented which showed the nature and cause of this dispute and showed the escalation of hostilities in the days immediately preceding the shooting, culminating in the weekend before the shooting, when the petitioner allegedly learned that the decedent planned to bring a gun to school and shoot him. Indeed, the petitioner concedes in his Second Amended Petition that:

> Several defense witnesses testified to threats made by the victim on the lives of Mr. Hall and his family – threats communicated to Mr. Hall prior to the shooting which had left him panicked and in fear ...

Rec.doc.no. 74. And:

> Indeed the evidence at trial established that Mr. Hall went to school that fateful morning expecting to be shot by Marlon Wells.

Id. (emphasis added). The petitioner would apparently like to have it both ways. He emphasizes to the Court that the substantial weight of the evidence adduced at trial -- regarding threats made against the petitioner and the petitioner's growing sense of fear and panic – was sufficient to support a finding of manslaughter instead of second degree murder, yet he also seeks to argue that this evidence was shoddily presented by attorney Monahan and that, had additional evidence been discovered and presented, the result of the jury's verdict likely would have been different. The Court is not persuaded. The Court has reviewed the petitioner's arguments regarding the witnesses who he believes should have been called to testify at trial and does not believe that the testimony of these witnesses would likely have had any impact upon the verdict.

In this regard, the petitioner suggests that attorney Monahan should have called as witnesses at trial two students, Eileen Turner and Cedric Dunn, who allegedly would have testified

regarding an incident occurring on the Thursday before the shooting, when Ms. Turner advised the petitioner not to go through a certain doorway at school because the decedent and friends were waiting on the other side to jump on him.[5]  This evidence, however, would have had minimal impact at trial.  It would have done little more than corroborate the petitioner's own testimony regarding the same incident, and although it may have provided additional evidence regarding the fact of an ongoing dispute and antagonism between the petitioner and the decedent, the existence of this dispute, as such, was never at issue at trial inasmuch as even the State's witnesses testified regarding the dispute and the likelihood of an impending fight between the parties.   While the testimony of these two witnesses may have provided additional evidence regarding the petitioner's increasing fear regarding a potential upcoming fight with the decedent, several witnesses testified to the likelihood of such a fight, and the petitioner's fear of a mere fistfight, which is all that this evidence would have tended to show, in no way provided justification for his bringing a firearm to school and acting preemptively to kill the decedent several days later, at a time when no fight was then imminent or threatened.

The petitioner also refers to a Glen Oaks teacher, Ms. Maloney, who allegedly would have testified that on one occasion she observed the petitioner "trying to reconcile differences" with the petitioner.[6]  This is likely referring to the incident testified to at trial, occurring on the Friday prior to the shooting, when the petitioner apparently approached the decedent and sought to defuse tensions, after which the petitioner and the decedent allegedly shook hands.  In the Court's view,

---

[5]     Specifically, the petitioner states that Eileen Turner "would have testified that she circumvented [the decedent] and the 'Flipside Boys' from crowding [the petitioner] by warning him of their plan and having [the petitioner] travel another route other than the one they expected.  She would have testified that [the decedent] confronted her in a hostile manner for having gotten involved." And as to Cedric Hall, he allegedly "would have testified that he was present when [the decedent] and the 'Flipside Boys' attempted to jump [the petitioner] on the same morning Eileen Turner tried to warn [the petitioner] and he intervened on [the petitioner's] behalf."

[6]     According to the petitioner, Ms. Maloney "would have testified that she walked up on one instance where [the petitioner] was trying to reconcile differences with [the decedent]."

however, this testimony would also have been of minimal relevance and would have merely corroborated other testimony regarding this incident. Further, the mere fact that the petitioner may have attempted to reconcile with the decedent on the Friday before the shooting does little to alter the course of events occurring later that same day and over the weekend, when hostilities apparently resumed and when the petitioner learned of the decedent's plan to bring a gun to school on Monday and kill him.

The petitioner also points to two other school employees, Ms. Coffer (or Caffer) and Ms. Jane Gillete, who he contends would have testified regarding an incident involving the decedent and Ms. Charlene Jones on the Thursday or Friday before the shooting, during which the decedent argued with Ms. Jones and slapped her in the face. According to the petitioner, Ms. Coffer would have testified that this confrontation occurred in her classroom and that during the confrontation, the decedent stated, "and I'm gonna kill that nigga!", who Ms. Jones explained to Ms. Coffer meant the petitioner.[7] In addition, Ms Gillete would allegedly have testified that after this incident, she spoke privately with Ms. Jones, learned of the dispute between the decedent and the petitioner, and phoned the decedent's mother to advise of the decedents' threat to kill a fellow student.[8] The petitioner's contentions relative to these witnesses, however, is misplaced. In the first place, the testimony available from these witnesses was not apparently unknown to attorney Monahan

---

[7] According to the petitioner, Ms. Coffer would have testified "that during her class, [the decedent] slapped Ms. Jones. Ms. Jones screamed, this got her attention. She ordered [the decedent] to report to the principle's [sic] office and [the decedent] stated, 'and I'm gonna kill that nigga!'. Ms Coffer talked to Ms. Jones about why [the decedent] slapped her and whom he was talking about killing. Ms. Coffer learned that the person to be killed was [the petitioner]."

[8] Ms. Gillete purportedly would have testified "that Charlene [Jones] was sent to her office after a fellow student [the decedent] slapped her. Through interviewing Ms. Jones she learned that the assault originated from a conversation which she had with [the petitioner] which Shyrone [the decedent's brother] observed and reported to his brother. Further she would have testified that she called [the decedent's] mother and informed her that [the decedent] had threatened to take the life of another student and during that conversation [the decedent's] mother told her not to call her house about things life [sic] that as those are children and they will work things out."

inasmuch as he subpoenaed Ms. Coffer, not only for trial, but also for pretrial evidentiary hearings and inasmuch as the petitioner has asserted that both of these witnesses gave similar testimony in court proceedings prior to trial.  See rec.doc.no. 24 at notes 1 and 2.  Accordingly, it is to be presumed that attorney Monahan made a strategic decision not to call these witnesses, perhaps because their testimony would have been cumulative of the same evidence elicited from Charlene Jones herself.  Further, it is likely that Ms. Coffer could only have testified to observing the referenced slap and to overhearing the referenced non-specific threat, made by the decedent, that he was going to "kill that nigga".  As to any purported explanation from Ms. Jones as to who the decedent was referring to, this testimony likely would have been excluded as inadmissible hearsay evidence.  Similarly, with regard to Ms. Gillete, this witness was admittedly not a witness to the physical altercation between the decedent and Ms. Jones or to the decedent's threat and so likely would not have been allowed to testify regarding Ms. Jones' hearsay statement and explanation regarding the threat and its meaning.  Accordingly, there is little substantive evidence which could have been provided by these witnesses, and the failure to call them as witnesses at trial does not appear to have been deficient performance.

The petitioner also asserts that attorney Monahan should have called as a witness Chantel Johnson, who he asserts "was standing with Ms. Jones on the Friday evening when [the decedent] told Ms. Jones that he was going to kill petitioner", see rec.doc.no. 21, or in contrast, "would have testified that she was present on several occasions when [the decedent] stated that he intended to kill [the petitioner]", see rec.doc.no. 24.  This testimony, however, would have been cumulative of other testimony, adduced from Charlene Jones and Jennifer Scott, regarding the decedent's threats to kill the petitioner, and the petitioner provides no information suggesting that Chantel Johnson ever herself communicated these threats to the petitioner prior to the shooting.  Under Louisiana law, in order for threats made against an accused to be admissible to show the accused's reasonable apprehension of danger (where the accused is not asserting a defense of self-defense),

it must be shown that the victim made a hostile demonstration or committed an overt act against the petitioner at the time of the offense and that the accused knew of the victim's prior threats. See State v. Sartain, 2 So.3d 1132 (La. App. 4th Cir. 2008), writ denied, 21 so.3d 274 (La. 2009); State v. Black, 907 so.2d 143 (La. App. 1st Cir. 2005), writ denied, 922 so.2d 1175 (La. 2006); La. C.E. art. 404(A). Accordingly, the fact of any threats overheard by Chantel Johnson, in addition to being cumulative and merely corroborative of other testimony, can have relevance likely only if such threats were communicated by her to the petitioner so as to heighten his growing sense of fear and panic and to thereby potentially diminish his culpability in connection with the shooting. In the absence of any suggestion in the record that the threats overheard by Ms. Johnson were communicated by her to the petitioner, there can be no deficient performance in the failure to call this witness at trial.

The petitioner also suggests that attorney Monahan should have called as a witness "the sister of Charlene Jones", who allegedly would have confirmed Ms. Jones' testimony regarding the decedent's threats to kill the petitioner during the weekend preceding the shooting and the petitioner's testimony regarding the decedent's refusal to accept an offer of money to refrain from doing so. This evidence, however, once again, would have been merely cumulative and duplicative of Ms. Jones' testimony, as well as that of witness Jennifer Scott, regarding such threats, and the petitioner offers no new information which this witness purportedly may have provided. Further, there is no suggestion that Ms. Jones' sister ever herself communicated the decedent's threats to the petitioner, and in the absence of such communication, her corroboration of the decedent's threats is of little relevance because her hearing these threats could have had no impact upon the petitioner's state of mind.

The petitioner also points to the testimony of two potential witnesses, Jerald Palmer and Chanda Pykes, who he apparently asserts could have impeached the testimony of two of the State's witnesses. First, Jerald Palmer could have impeached the testimony of Derrick Holden, who

testified regarding his discovery of the murder weapon in the grass on a nearby street on the date of the shooting.[9] This evidence, however, would have been of minimal relevance at trial because, as previously noted, the petitioner did not dispute that he fired the shot which killed the decedent. Accordingly, any impeachment regarding the manner in which the gun was later recovered can have had no impact upon the verdict. And with regard to Chanda Pykes, this witness allegedly would have impeached the testimony of her cousin, Sheresa Pykes, who testified that she overheard the petitioner making incriminating remarks at the bus stop on the morning of the shooting. Whereas Sheresa Pykes testified that she knew the petitioner only casually, the petitioner contends that their relationship was in fact more longstanding and included some intimacy.[10] In this regard, Sheresa Pykes testified at trial that she rode the school bus with the petitioner and knew him from "speak[ing] and talk[ing] to him from the corner" (Tr. Record at p. 642), and that, "I see him – I sees him on the corner and walking to the store or something like that, but not talking to him" (Tr. Record at p. 644). According to the petitioner, however, this statement could have been impeached with testimony of an alleged "longstanding association and some intimacy" between the witness and the petitioner, see rec.doc.no. 24. Notwithstanding, the Court is unable to discern how such impeachment could have altered the course of the trial. Specifically, the referenced testimony was sufficiently vague and ambiguous regarding the witness' relationship with the petitioner as to have arguably included a "longstanding" connection between the parties. Accordingly, there is no basis for concluding that the petitioner's failure to call this witness amounted to deficient performance or resulted in prejudice to the petitioner.

---

[9] Mr. Palmer allegedly "would have testified as to whether he walked to school with Derrick Holden."

[10] Chanda Pykes allegedly "would have testified that she personally knew of longstanding association and some intimacy shared between her cousin and [the petitioner], which would have contradicted the trial testimony of this witness when she said she barely knew [the petitioner]. She just say him sometime walking through the neighborhood."

Finally, for the first time in the counseled Second Amended Petition, the petitioner suggests that attorney Monahan should have investigated and discovered witnesses "such as Creshonda Coleman, who were available and could have testified about the victim's reputation for violence", should have "developed proof that, at the time of his death, the victim was being prosecuted ... on the charge of simple battery of a juvenile", should have called as a witness the petitioner's mother to testify that, shortly before the shooting, he told her he was "having difficulties with people at school", and should have called as witnesses the petitioner's aunts to corroborate his assertion that he hardly slept on the night before the offense. The Court is not persuaded by these assertions. First, as for Creshonda Coleman, the petitioner provides no information whatever regarding who this witness is, the details of this witness' testimony, that the witness was available to testify, or any indication that the petitioner was aware of the decedent's "reputation for violence". The Court further notes, as previously stated, that under Louisiana law, it appears that in order to admit evidence of a victim's reputation for violence (where he is not asserting a defense of self-defense), a prior foundation must be laid in the form of an appreciable showing of "a hostile demonstration or overt act on the part of the victim at the time of the offense charged." See State v. Black, supra. Similarly, the mere fact that the petitioner may have been charged with simple battery of a juvenile, as additional proof of the decedent's reputation, would be neither relevant nor admissible in the absence of a showing or assertion, nowhere made in the petitioner's pleadings, that he was aware of such reputation. See id. And in any event, it appears from the record that attorney Monahan elicited testimony from several witnesses that the decedent was being prosecuted for simple battery (Tr. Record at pp. 574) and had recently been suspended from school for "fighting" (Tr. Record at pp. 574, 593, 737). Accordingly, this evidence was ultimately placed before the jury. With regard to the petitioner's mother, her proposed testimony, that the petitioner told her he was "having difficulties with people at school", would have been merely cumulative of other undisputed testimony regarding the feud between the petitioner and the decedent, including testimony from the

30

petitioner's uncle that the petitioner spoke with the uncle prior to the shooting regarding the conflict he was having with the decedent at school. And finally, the failure to call the petitioner's aunts to corroborate his assertion that he slept very little on the night before the shooting has not been shown to be deficient conduct. This information was elicited from the petitioner himself and was not disputed by the State.

The gist of the petitioner's argument is that had the above witnesses been called to provide what appears to be largely cumulative and marginally relevant testimony, then there is a likelihood that the result of the trial would have been different. However, merely because the jury could have concluded that the petitioner's conduct amounted to the lesser offense of manslaughter instead of second degree murder does not compel a conclusion that it must have reached that conclusion or that the petitioner's attorney provided ineffective assistance because it failed to do so. Manslaughter in Louisiana is defined as:

> A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection.

La. R.S. 14:31. This statute further provides that:

> Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed ....

Id. While an effort was made at trial to portray the petitioner's state of mind as fearful and frantic, the petitioner faced a substantial hurdle to overcome. Specifically, the evidence was undisputed at trial that, immediately prior to the shooting on the morning of February 17, 1992, the decedent made no overt threatening gestures to the petitioner and voiced no threatening words. Further, the petitioner testified that, although he thought he saw a shiny object in the hand of one of the decedent's friends before the shooting, he did not see a weapon of any kind in the possession of the decedent. Finally, it appears clear from the evidence adduced at trial that, at the time of the

shooting, the decedent and his friends had passed the petitioner on the walkway and were walking away from him. It is difficult to discern in this factual scenario, therefore, the sudden passion or heat of blood, <u>caused immediately</u> by <u>adequate provocation</u>, which would have caused the petitioner to lose his self-control or cool reflection at the moment of the shooting. To the contrary, the evidence suggested more than a little planning and premeditation in light of testimony reflecting that the petitioner exhibited a bullet to a fellow student on the bus before the shooting, bragged about his impending notoriety and trip to "parish", had in his possession a gun at the time of the shooting, and was able to dispose of the weapon so quickly after the shooting. And when this evidence is combined with the testimony of multiple fellow students that the petitioner stood over the victim afterward, taunting the fallen body, it is readily apparent that the best possible defense may not have altered the verdict in this case.

Accordingly, based upon the foregoing, the Court is unable to conclude that attorney Monahan's failure to call any or all of the above-identified witnesses amounted to deficient performance on the petitioner's behalf. The petitioner has provided no evidence whatever, other than his own conclusory statement, that these witnesses were available and/or were willing to testify as he states. Nor is it possible to conclude that the failure to locate or call these witnesses at trial was a product of the alleged conflict of interest between the petitioner and the State. Finally, and most importantly, it does not appear that the petitioner suffered any prejudice in fact as a result of the failure to locate or call the referenced witnesses inasmuch as their testimony was largely cumulative of other evidence adduced at trial and/or was peripheral to the central issues in the case. In short, the petitioner has not set forth a sufficient showing that, accepting his factual assertions as true, his lead trial attorney provided deficient performance at trial which resulted in a verdict that, had the additional testimony been adduced at trial, would to a reasonable likelihood have been different. Accordingly, there is no basis for the grant of habeas corpus relief relative to this issue.

## Withdrawal Of Insanity Defense

The petitioner also asserts that he was provided with ineffective assistance of counsel because his attorney withdrew his plea of "not guilty by reason of insanity" and failed to ensure that the petitioner was not brought to trial while incompetent. It is not entirely clear from the petitioner's argument in this regard whether he is complaining relative to the issue of competency at the time of the offense or competency at the time of trial, or both. The petitioner does not, however, provide any medical records to support his assertions, nor does he advise the Court of the nature of any purported mental condition or diagnosis at the time of trial or at the time of the charged offense. Rather, it appears that he principally relies upon the fact, testified to at trial, of his growing fear and panic in the days preceding the shooting, upon his "somewhat unconscious state of mind" on the morning thereof, and on the fact that he was observed pacing and talking to himself immediately prior to the shooting.

In a case where the petitioner asserts the affirmative defense of insanity, the ultimate issue is whether, at the time of the offense, the petitioner was incapable of appreciating the nature and wrongfulness of his conduct. United States v. Levine, 80 F.3d 129 (5th Cir.), cert. denied, 519 U.S. 824, 117 S.Ct. 83, 136 L.Ed.2d 40 (1996). In addition, the Constitution prohibits the trial and conviction of a criminal defendant who is mentally incompetent at the time of trial. See Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966). There is a two-part standard for ascertaining competency to stand trial: (1) whether the petitioner has the sufficient present ability to consult with his attorney with a reasonable degree of rational understanding, and (2) whether he has a rational as well as factual understanding of the proceedings against him. Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). As a threshold matter, a petitioner in a habeas proceeding claiming that he was incompetent at the time of trial must first come forward with "meaningful evidence" of mental incompetency. See Demosthenes v. Baal, 495 U.S. 731, 110 S.Ct. 2223, 109 L.Ed.2d 762 (1990); Whitmore v. Arkansas, 495 U.S. 149, 110 S.Ct. 1717, 109

L.Ed.2d 135 (1990). He must present facts sufficient to positively, unequivocally and clearly generate a real, substantial and legitimate doubt as to his mental competency. <u>Dunn v. Johnson</u>, 162 F.3d 302 (5th Cir. 1998), <u>cert. denied</u>, 526 U.S. 1092, 119 S.Ct. 1507, 143 L.Ed.2d 659 (1999). Brief and conclusory allegations that his attorney's representation was deficient because of a failure to investigate and develop useful evidence will not suffice. <u>Anderson v. Collins</u>, 18 F.3d 1208 (5th Cir. 1994). In determining whether there is sufficient evidence to require an evaluation of mental competency, the Fifth Circuit has focused on three factors: existence of a history of irrational behavior, the petitioner's demeanor at trial, and prior medical opinions. <u>United States v. Williams</u>, 819 F.2d 605 (5th Cir. 1987), <u>cert. denied</u>, 484 U.S. 1017, 108 S.Ct. 726, 98 L.Ed.2d 675 (1988).

The petitioner in this case has presented nothing more than a conclusory assertion of ineffective assistance in this regard. The petitioner was examined by two independent mental health professionals prior to trial and the written reports of both opine that the petitioner was fully able to assist his counsel at trial. Further, while one of the reports was silent with regard to the petitioner's competency at the time of the offense, the report provided no indication to the contrary, and the other report clearly states that the examining physician could not "elicit a psychosis at the time of the alleged offense or at any other time in his life" (Tr. Record at p. 37). The petitioner has pointed to no mental health treatment in his past which may have triggered a further investigation by his attorney. And in any event, many individuals charged with criminal conduct suffer from some form of mental infirmity. This fact alone is insufficient to warrant a psychological or psychiatric evaluation in every case. <u>See</u> <u>Bouchillon v. Colllins</u>, 907 F.2d 589 (5th Cir. 1990)(not all people who have a mental problem are rendered by it legally incompetent). <u>See also</u> <u>Theriot v. Whitley</u>, 18 F.3d 311 (5th Cir. 1994) (denying habeas relief where the record was "glaringly devoid of any evidence placed before the court or [the defendant's] counsel as to defendant's mental capacity."); <u>Carter v. Kelly</u>, 2009 WL 6591446 (S.D. Miss., Sept. 11, 2009) (denying habeas relief where, although the petitioner had "some mental issues", he "failed to establish that he could not distinguish right from

wrong at the time of the crimes"); <u>Boston v. United States</u>, 2008 WL 2704314 (W.D. Tex., July 8, 2009) (denying habeas relief where, although there was evidence of "a history of mental illness", including treatment for attention deficit disorder, the petitioner had "not provided sufficient evidence either that he was mentally incompetent at the time of trial [that he was legally insane at the time of the offense] or that a further investigation into his mental health history would have led a reasonable attorney to a different conclusion"). In short, the petitioner's claim that he may have been incompetent at the time of trial or legally insane at the time of the offense is pure speculation and is not supported by any evidence in the record. The petitioner has failed to come forward with meaningful evidence of insanity or mental incompetency. He offers no facts which positively, unequivocally and clearly generate a real, substantial and legitimate doubt as to his insanity or mental competency. Further, nothing in the testimony of any witness at trial suggested that, at the time of arrest, the petitioner was unable to appreciate the nature or wrongfulness of his actions. In other words, the petitioner has failed to establish that his attorney erred in failing to pursue a mental illness defense or a mental incompetency claim at trial, and he has failed to establish that he was prejudiced as a result of such failure.

Consideration Of Other Claims

Turning to a consideration of those claims which the Court has found are barred from consideration by virtue of <u>Mayle v. Felix</u>, the Court will nonetheless provide a review of same because it does not appear from the record that these claims would alter the Court's conclusion relative to the petitioner's inadequate showing of deficient performance and actual prejudice resulting therefrom. Initially, although the petitioner repeatedly asserts that attorney Monahan, because of the pending federal and state criminal investigation conducted against him, rushed the case to trial and was thereby unquestionably burdened with a desire to "curry favor" and ingratiate himself with the prosecution, the trial transcript does not bear this out. Instead, it appears that more than two months prior to trial, attorney Monahan had fully in place an agreement with state and

federal prosecutors regarding his plea of guilty to the pending drug charges and with regard to the sentence that he would receive as a result of such plea. At that point, there was no further need for him to "curry favor" with the prosecution. And in fact, the transcript reveals a relationship between attorney Monahan and the district attorney which was anything but cordial, respectful or ingratiating. The attorneys continuously and repeatedly engaged in rancorous and acrimonious discourse, both in front of the jury and in discussions off the record, and although the petitioner seeks to argue that this contentious relationship was limited somehow to issues of minor importance, while issues of greater importance were ignored, this argument is not persuasive. If attorney Monahan were seeking to curry favor with the prosecution, there is no reason why he would have nonetheless created a record replete with argumentation, disrespect and disputatious conduct.

As a result of the supposed rush to trial, the petitioner contends that attorney Monahan failed to engage in warranted pre-trial motion practice, failed to seek supervisory writs from adverse pre-trial rulings, and failed to allow himself sufficient time to investigate and prepare the case for trial, because by doing so he avoided the need to withdraw from the case because of his approaching sentencing in federal court. As previously noted, however, attorney Monahan filed a number of pre-trial motions and attended evidentiary hearings in connection therewith, and the petitioner has failed to identify a single specific motion which should have been filed or pursued but was not. Moreover, attorney Monahan moved for a change of venue on the morning of trial, and twice moved for a mistrial during the trial, the granting of any of which motions would certainly have necessitated a continuance of the trial date. This belies the petitioner's contention that attorney Monahan was willing to prejudice the defense in order to maintain an unreasonably precipitous trial date. And with regard to the purported failure to seek supervisory writs, the petitioner refers specifically to only two pretrial rulings, the denial of a motion to reduce the petitioner's bond and the denial of a motion to suppress inculpatory statements made to police officers after the

petitioner's arrest. The petitioner, however, points to no reported decisions wherein the failure to seek supervisory review of a pretrial ruling has been found to be deficient performance, and this Court has discovered none. Moreover, it cannot be shown that the petitioner suffered any prejudice as a result of the failure to pursue writs from these rulings inasmuch as it is extremely unlikely that the trial court's discretionary bond determination (in the amount of $250,000) would have been overturned by the appellate court in this second degree murder case, see Dowell v. C.M. Lensing, 805 F.Supp. 1335 (M.D. La. 1992) (no prejudice resulting from failure to obtain release on bond); Ballard v. Cain, 2006 WL 980674 (E.D. La., Apr. 12, 2006) (no prejudice resulting from failure to seek bond reduction), and inasmuch as the petitioner obtained review of the ruling on the motion to suppress on direct appeal to the Louisiana Court of Appeal for the First Circuit, which court upheld the trial court's ruling.

The petitioner also asserts to be deficient attorney Monahan's failure to secure from the State an offer of a plea to the lesser offense of manslaughter. According to the petitioner, without any elucidation or factual support, the petitioner contends that, had attorney Monahan engaged in additional pretrial investigation or motion practice, had he not "rushed" the case to trial, or had he not been laboring under an inherent conflict of interest, he could have obtained for the petitioner such a plea agreement. This assertion, however, is entirely speculative, and there is no basis in the record for concluding that the State would have consented to such a plea. To the contrary, considering the overwhelming evidence of guilt and the brutal and, apparently (judging from the testimony of fellow students regarding the statements of the petitioner on the morning of the shooting), premeditated nature of the offense, it is extremely unlikely that the State would have done so. In any event, it is nowhere asserted in the petitioner's Second Amended Petition that such an offer was in fact obtainable from the State, and on the basis of the pure speculative nature of this assertion, the Court is unable to conclude that the failure to secure such an offer was deficient performance on attorney Monahan's part.

The petitioner next suggests that petitioner Monahan provided ineffective assistance of counsel because he failed to vigorously pursue from the State exculpatory evidence in the State's possession in accordance with Brady v. Maryland. Relative to this contention, the petitioner refers to two (2) instances during the petitioner's trial when attorney Monahan made mention of exculpatory evidence which had allegedly been withheld from the defense. Specifically, during one discussion outside of the jury's presence, attorney Monahan stated that he had interviewed a witness prior to trial and learned from the witness that the decedent owned or possessed a firearm, a fact which attorney Monahan believed to be exculpatory. Specifically, attorney Monahan stated:

> [O]n May 29th, Judge, I took a statement from Charlene Jones, and through no obligation of my own, even though I got him holding Brady information back, I provided him with a copy of the statement from Charlene Jones which clearly indicated that Charlene said [the deceased] owned a gun.

(Tr. Record at p. 579). And at a later point during trial, when the State sought to re-call a witness, Barry Ellis, to clarify certain confusing aspects of this witness' testimony, the State specifically offered the trial judge an opportunity to review the grand jury testimony of the witness "to show the consistency of his testimony", which offer the trial judge refused. (Tr. Record at p. 627). Attorney Monahan then sought production of the grand jury testimony on the purely speculative basis that "there may be Brady material in that grand jury testimony". Id. From these two brief and oblique references, together with a post-trial review of the State's files, which were apparently obtained by the petitioner after the conclusion of the state court proceedings, the petitioner has manufactured an argument that attorney Monahan provided ineffective assistance by failing to more aggressively pursue the production of Brady material.

This argument is not persuasive. Initially, with regard to the two referenced instances of alleged withholding of Brady evidence, the petitioner is unable to show any prejudice relative to the former and has not established a violation relative to the latter. Specifically, by the petitioner's own admission, attorney Monahan learned from Ms. Jones, prior to trial, that the decedent owned or

possessed a handgun and, as a result, the petitioner cannot complain that he suffered any prejudice relative to the prosecution's failure to disclose this information. And with regard to the grand jury testimony of witness Barry Ellis, there is no showing in fact that any portion of this testimony constituted Brady evidence which the prosecution was obligated to disclose. The remainder of the petitioner's argument relative to Brady evidence, in the Court's view, impermissibly places the cart before the horse. Specifically, in support of his contention that attorney Monahan should have more actively sought Brady evidence from the prosecution, he points repeatedly to evidence obtained from the prosecution's files, after trial, which evidence he contends may have altered the course of the trial had it been provided to Monahan. However, while the referenced evidence, in the form of the recorded statements of witnesses, the written investigative notes of witness interviews, and the petitioner's police records relative to the pending charge of simple battery of a juvenile and a juvenile prosecution for aggravated battery, may have supported an independent claim of prosecutorial misconduct under Brady, that claim is not before this Court. To the contrary, in the absence of any suggestion that attorney Monahan knew that the prosecution's files contained additional Brady material, he had no independent obligation to more aggressively pursue it. The record reflects, in fact, that attorney Monahan propounded discovery to the State, explicitly requesting all Brady material in the State's possession, and the State responded that it had none. The assertion by the petitioner that attorney Monahan should have unilaterally moved for the state trial judge to review the entirety of the prosecution's files in order to search for undisclosed Brady materials is untenable, and any such motion unquestionably would have been denied. In fact, as noted above, when the prosecution offered to have the trial judge review the grand jury testimony of a single witness, the trial judge rejected this suggestion. In short, the Court finds no support for this claim in the record or in the petitioner's submission to this Court, and this claim should therefore be rejected.

The petitioner next contends that attorney Monahan failed to subject the State's case to

meaningful adversarial testing. According to the petitioner, this failure took the form of (1) acquiescing in the State's objection to witness testimony, (2) failing to object to inadmissible testimony regarding the decedent's good character and his parents' difficult decision whether to donate his organs, (3) failing to object to gruesome photographs taken at the decedent's autopsy, (4) failing to object to commentary by the prosecution and hearsay testimony from an expert ballistics witness, (5) failing to object to an improper attack upon the credibility of witness Charlene Jones during the State's opening statement, and (6) entering into an agreement with the prosecution for the respective attorneys not to object during the closing arguments of the other.

First, the petitioner contends that attorney Monahan acquiesced in frivolous objections interposed by the prosecution, but points specifically only to one such instance. Specifically, the petitioner contends that when attorney Monahan attempted to elicit testimony on cross-examination from a State witness, Barry Ellis, that the witness had recently been arrested on a felony charge of carnal knowledge of a juvenile, the State objected to this line of questioning, and attorney Monahan allegedly wrongfully acquiesced in the State's objection. (Tr. Record at pp. 620-21, 638). In pursuing this line of questioning, attorney Monahan was apparently attempting to suggest to the jury that the witness, because of the pending charge, may have had an incentive to assist the prosecution with testimony damaging to the accused. Notwithstanding the objection of the prosecution, however, attorney Monahan was in fact able to elicit from the witness that the witness had recently been arrested in connection with the referenced charge. (Tr. Record at p. 638). Further, attorney Monahan explicitly inquired whether the witness had made "any deals with the State of Louisiana" for his testimony, to which question, the witness responded "no". (Tr. Record at p. 621). Moreover, it appears that the trial judge ultimately upheld the prosecution's objection in any event and foreclosed any further questioning regarding the pending charge. Id. Accordingly, any supposed acquiescence by attorney Monahan in the State's objection can have had no prejudice upon the petitioner's case.

Turning to attorney Monahan's asserted failure to object to testimony presented from the parents of the deceased, relative to the decedent's good qualities, the petitioner points specifically only to testimony elicited from the decedent's father that the decedent assisted with the family business and was a good worker. (Tr. Record at p. 587). This is benign testimony at best, and the Court notes that attorney Monahan had previously attempted to object to similar questioning eliciting general background information about the decedent, and the Court had overruled these objections. (Tr. Record at pp. 562-63). And with regard to other colloquy by the prosecution and testimony elicited from the decent's parents which may have portrayed the decedent in a positive light, e.g., that he went to church and sang in the church choir, attorney Monahan in fact objected when the prosecution related this information in the State's opening statement, (Tr. Record at pp. 543-44), and the remaining testimony in this regard was elicited in response to questions regarding the events of the weekend preceding the shooting and was not the result of an apparent overt attempt to elicit testimony regarding the decedent's good qualities. Further, with regard to the testimony elicited from the decedent's father regarding the decision made, on the day of the shooting, whether to donate the decedent's organs (Tr. Record at pp. 590-92), it is likely that attorney Monahan made a tactical decision to refrain from making an objection at that time upon a determination that interrupting the witness' emotional testimony regarding that decision may have prejudiced the jury against him and may have drawn more attention than necessary to the testimony. In this regard, the tactical decisions of counsel are entitled to great deference, and "[t]he decision not to object falls squarely within the wide range of reasonable trial tactics." Hernandez v. Thaler, 398 Fed.Appx. 81 (5th Cir. 2010), cert. denied, ___ U.S. ___, 2011 WL 203669 (S.Ct., Apr. 18, 2011). See also United States v. Cisneros, 456 F.Supp.2d 826 (S.D. Tex. 2006) (observing that "[f]ailing to object to admission of certain evidence, failing to adequately develop witness testimony, failing to adequately cross examine, and failing to request a jury instruction are within the realm of tactical determinations and do not constitute objectively unreasonable

performance"), citing United States v. Rubin, 433 F.2d 442 (5th Cir. 1970), cert. denied, 401 U.S. 945, 91 S.Ct. 961, 28 L.Ed.2d 228 (1971). Accordingly, the Court will not second-guess the decision of attorney Monahan to refrain from objecting to this testimony.

With regard to the asserted failure on the part of attorney Monahan to object to the admission into evidence of purported gruesome photographs, the petitioner points specifically to two (2) autopsy photographs showing the decedent's open skull and forceps indicating the path of the bullet through the decedent's head. In this regard, the law in Louisiana is that "the test of admissibility of allegedly gruesome photographs is whether their probative value outweighs the possible prejudice that may result from their display to the jury." State v. Valentine, 364 So.2d 595 (La. 1978). Further, "photographs are generally admissible which illustrate any fact or which shed light on an issue, or are relevant to describe the person, place or thing involved." Id. In the instant case, the referenced photographs were admitted during the testimony of the State's forensic specialist and were utilized to show the path of the bullet (from the back of the decedent's head forward and in an upward direction), thereby indicating the angle of the gun when it was fired by the petitioner. Attorney Monahan successfully objected to several of the crime scene and autopsy photographs as duplicative and, in the Court's view, the referenced photographs were relevant to "illustrate" and shed light on the facts testified to by that witness. Accordingly, the Court declines to find that their probative value of these photographs was outweighed by any resulting prejudice, and accordingly, the failure to object thereto did not amount to deficient performance. See, e.g., Reed v. Warden, Louisiana State Penitentiary, 2009 WL 1361494 (W.D. La. 2009) (photographs admissible to show the trajectory of the shot, the angle of the gun at the time of the shooting, and how close the victim was to the shooter).

With regard to attorney Monahan's failure to object to the State's presentation of expert hearsay testimony and commentary with respect thereto, this contention relates to the State's ballistics expert having been unavailable for trial, which resulted in the State retaining another

expert to conduct a repeat of the pertinent ballistics tests in order to testify that the conclusions reached by the initial expert, that the firearm introduced at trial was the one utilized in the murder, were correct. While the petitioner appears to be correct in his assertion that the testimony and commentary regarding the previous expert's conclusions were subject to a hearsay objection, cf., Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Court sees no prejudice resulting from this testimony. The opinions of the two experts were identical and undisputed and, more importantly, as previously noted, the petitioner did not dispute that he committed the offense alleged. Thus, the testimony linking the murder to the firearm, which was recovered over a week after the shooting, was neither critical nor an important component of the evidence presented at trial. Accordingly, any error in the admission of this testimony and commentary and any failure by attorney Monahan to object thereto was harmless.

With regard to attorney Monahan's asserted failure to object to prosecutorial misconduct during the State's opening statement, the petitioner refers only to a purported attack upon the credibility or reputation of witness Charlene Jones. The alleged objectionable statement in this regard was that Ms. Jones was "alleged to be the step-daughter of Percy Sledge" and "had somewhat of a reputation of having money and credit cards" (Tr. Record at p. 542). The Court, however, perceives no deficient performance or prejudice which may be attributed to any failure to object to this relatively benign comment.

Finally, the petitioner complains that attorney Monahan entered into an agreement with the prosecution, pursuant to which the respective attorneys agreed not to object during each other's closing statements. Specifically, as stated by attorney Monahan during his summation:

> Although we argued the entire time, we agreed, we were not going to interrupt each other and we could have our say here in closing and I didn't stand up when [the prosecutor] was misrepresenting the testimony and the evidence but now is my turn to have my say with regards to how he did it.

Rec.doc.no. 74-1 at p. 161. As a result of this agreement, according to the petitioner, the

prosecution engaged in numerous instances of misconduct, including urging the jury to send a message to the community, inflaming the jury with speculative remarks about the victim's thoughts and state of mind at the time of the shooting, and commenting on the life the petitioner would lead in prison. This contention, more than any other perhaps, underscores the rationale for the rule enunciated in <u>Mayle v. Felix</u>, <u>supra</u>. The petitioner made no contention before the state trial court regarding this claim and no similar claim in this Court until after the Court recommended dismissal of the petitioner's application. It appears that the closing arguments in this case were not even transcribed until more than fifteen (15) years after the trial of the case. Clearly, therefore, this claim does not arise out of the "core of operative facts" asserted in the original timely application for habeas relief. Moreover, the Court has reviewed the closing arguments of the State and, while certain statements made therein may have been objectionable, the Court does not find that these statements, "in the context of the entire trial, were sufficiently prejudicial to violate [the petitioner's] due process rights." <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). "[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned. The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." <u>Darden v. Wainwright</u>, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), <u>quoting</u> <u>Donnelly v. DeChristoforo</u>, <u>supra</u>. "The prosecutor's remarks do not present a claim of constitutional significance unless they were so prejudicial that [the petitioner's] state court trial was rendered fundamentally unfair within the meaning of the Fourteenth Amendment." <u>Rushing v. Butler</u>, 868 F.2d 800 (5th Cir. 1989). A trial is fundamentally unfair only if the prosecutor's remarks evinced either persistent or pronounced misconduct, or the evidence was so insubstantial that in all probability, but for the remarks, the petitioner would not have been convicted. <u>Id.</u>, <u>citing</u> <u>Kirkpatrick v. Blackburn</u>, 777 F.2d 272 (5th Cir. 1985), <u>cert. denied</u>, 476 U.S. 1178, 106 S.Ct. 2907, 90 L.Ed.2d 993 (1986). When attacked, prosecutorial comments are not considered in isolation, but are evaluated in the context of the

entire trial as a whole, including the prosecutor's entire closing argument. <u>Rushing</u>, <u>supra</u>; <u>Kirkpatrick</u>, <u>supra</u>. In undertaking an analysis of whether a prosecutor's argument deprived a petitioner of a fair trial, a court should consider (1) the magnitude of the prejudicial effect of the statements, (2) the efficacy of any cautionary instruction; and (3) the strength of the evidence of the petitioner's guilt. <u>United States v. Ellender</u>, 947 F.2d 748 (5th Cir. 1991); <u>United States v. De La Rosa</u>, 911 F.2d 985 (5th Cir.), <u>cert. denied</u>, 500 U.S. 959, 111 S.Ct. 2275, 114 L.Ed.2d 726 (1991) (applying harmless error analysis in the context of prosecutorial misconduct in the form of improper comments during trial).

Based upon a review of the record, the Court does not find that the prosecutor's comments, evaluated in the context of the entire trial, rendered the petitioner's trial fundamentally unfair, or that attorney Monahan's determination to refrain from objecting thereto was deficient performance which caused prejudice to the petitioner. The evidence of guilt in this case was overwhelming, and attorney Monahan obviously made the strategic determination that his client would benefit from his presentation of a closing argument, the flow of which was not interrupted by repeated objections from the prosecution, and the thrust of which could more effectively present the emotional argument that, notwithstanding the brutal nature of the petitioner's offense, a manslaughter verdict was appropriate in light of his youth and the fear instilled in him as a result of the decedent's threats. Although this strategy was ultimately unsuccessful, the Court will not second-guess this tactical decision, particularly where the prosecutor's colloquy was not so persistently and markedly improper that the Court is able to conclude that, but for the remarks, the petitioner would not have been convicted of second degree murder. Accordingly, the petitioner's claim in this regard should be rejected.

### Request For An Evidentiary Hearing

As previously noted, the petitioner has filed a Motion for an Evidentiary Hearing, rec.doc.no. 84. Pursuant to 28 U.S.C. § 2254(e)(2), however, this Court is limited in its authority to hold an

evidentiary hearing in a habeas proceeding. Specifically, where a habeas petitioner "has failed to develop the factual basis of a claim in State court proceedings, the court <u>shall not</u> hold an evidentiary hearing unless the applicant shows that (A) the claim relies on ... a factual predicate that could not have been previously discovered through the exercise of due diligence; and (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense". (Emphasis added). In the instant case, the petitioner wholly failed to develop, in the state courts, the factual basis for his claim asserted here that attorney Monahan provided ineffective assistance of counsel through the specific acts and omissions alleged herein, and that this ineffective assistance resulted in prejudice to the petitioner. Instead, the petitioner's application for post-conviction relief in state court asserted only, as examples of attorney Monahan's deficient performance, that attorney Monahan (1) failed to inform the petitioner and the petitioner's family of the drug charges pending against him, (2) failed to inform the judge of the pending charges, (3) failed to publicize the fact of the pending charges, and (4) entered into a plea agreement relative to the pending charges with the same district attorney's office which was prosecuting the petitioner. The petitioner made no attempt, however, to allege or show other deficient conduct by his attorney, or any resulting prejudice, and relied instead upon his erroneous legal conclusion that prejudice should be presumed. Moreover, the petitioner held steadfast to this erroneous legal conclusion and made no effort to assert any other specific deficient acts or omissions by attorney Monahan or to show any resulting prejudice. The most which may be gleaned from the state court record is that, in a Motion to Reconsider before the Louisiana Court of Appeal for the First Circuit, the petitioner suggested, without corroboration or evidentiary support, that if given the opportunity, he could establish prejudice resulting from attorney Monahan's actions in failing to "protect petitioner's right not to be tried before he was held to be competent to stand trial." This Motion to Reconsider, however, was procedurally deficient and was not entertained by the state appellate court.

Based upon the foregoing, the Court concludes that the petitioner is not entitled to an evidentiary hearing in this case. He unquestionably failed to develop the factual basis for his claims in the state court, and his failure to do so is directly attributable to his lack of diligence. He made no effort before the state court, for example, to identify those witnesses who he now contends should have been called by attorney Monahan, to present affidavits or other evidence reflecting the substance of the witnesses' testimony or that they were available and willing to testify, or to identify any of the evidence which he now contends could or should have been discovered through a more diligent investigation or through a more aggressive pursuit of <u>Brady</u> material from the State. Although the petitioner now argues that he should not be faulted for his failure to develop the facts in state court because he requested and was denied an evidentiary hearing in that venue, the law is clear that "[m]ere requests for evidentiary hearings will not suffice; the petitioner must be diligent in pursuing the factual development of his claim." <u>Dowthitt v. Johnson</u>, 230 F.3d 733 (5th Cir. 2000), <u>cert. denied</u>, 532 U.S. 915, 121 S.Ct. 1250, 149 Led.2d 156 (2001) (finding that a habeas petitioner failed to show due diligence where he failed to present affidavits in the state habeas court from witnesses who he claimed would have provided material information, did not show that the affidavits could not readily have been obtained, and where "[a] reasonable person in [the petitioner's] place would have at least done as much."). <u>See also</u> <u>Pierce v. Thaler</u>, <u>supra</u>. (finding that, by failing to provide affidavits from purported witnesses in state court, the petitioner "failed to take the proper steps to support a request for an evidentiary hearing in federal district court."). In this case, in light of the petitioner's failure to attempt to show, in state court, the specific deficient performance of his trial attorney and the prejudice resulting therefrom, the petitioner has failed to establish his entitlement to an evidentiary hearing in this case.

In summary, a review of the record of the petitioner's trial, at which he was represented by two attorneys, reflects a well-defended and hard-fought case which took place over a period of four (4) days. The petitioner's attorneys engaged in discovery, filed numerous contradictory motions,

conducted a vigorous voir dire examination of individual prospective jurors and generally put forth an energetic opposition to the State's case. The evidence adduced at trial clearly reflects that the petitioner discharged a firearm into the back of the head of the deceased victim, with whom the petitioner had experienced continuing and escalating hostility over a period of several days. There is nothing in the record or in the petitioner's argument which supports his contention that attorney Monahan's representation was rendered ineffective by reason of the supposed conflict of interest or that the petitioner was materially prejudiced by such representation. Accordingly, the petitioner's application must be dismissed.

Based upon the foregoing, this Court concludes that the petitioner's application for habeas corpus relief in this Court is without merit and should be dismissed.

## RECOMMENDATION

It is recommended that the petitioner's Motion for an Evidentiary Hearing, rec.doc.no. 84, be denied, and that his application for habeas corpus relief be dismissed, with prejudice.

Signed in Baton Rouge, Louisiana, on May 20, 2011.

**MAGISTRATE JUDGE DOCIA L. DALBY**

# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

KIRT K. HALL                                         CIVIL ACTION

VERSUS

BURL CAIN, WARDEN, ET AL.                            NO. 99-0541-BAJ-DLD

## <u>NOTICE</u>

Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the United States District Court.

In accordance with 28 U.S.C. § 636(b)(1), you have fourteen (14) days after being served with the attached Report to file written objections to the proposed findings of fact, conclusions of law and recommendations therein. Failure to file written objections to the proposed findings, conclusions, and recommendations within 14 days after being served will bar you, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions of the Magistrate Judge which have been accepted by the District Court.

ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.

Signed in Baton Rouge, Louisiana, on May 20, 2011.

_____

**MAGISTRATE JUDGE DOCIA L. DALBY**